

Doc #146

FILED

DEC - 6 2016

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FILED**

**Dec 06, 2016**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In re:

INTERNATIONAL MANUFACTURING
GROUP, INC.,

             Debtor.

BEVERLY N. McFARLAND,
Chapter 11 Trustee,

             Plaintiff,

v.

CALIFORNIA BANK AND TRUST, et
al.,

             Defendants.

Case No. 14-25820-D-11

District Court No.
2:16-cv-2873 WBS (BK)

Adv. Pro. No. 16-2090-D

Docket Control No. BN-2

DATE: November 30, 2016
TIME: 10:00 a.m.
DEPT: D

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On September 21, 2016, defendant ZB, N.A. (the "Bank") filed a motion to dismiss the first amended complaint ("Amended Complaint") of the plaintiff, Beverly McFarland, who is also the trustee in the chapter 11 case in which this adversary proceeding is pending (the "trustee"), pursuant to Fed. R. Civ. P. 12(b)(6), made applicable in this proceeding by Fed. R. Bankr. P. 7012(b), for failure to state a claim upon which relief can be granted. The trustee has filed opposition, the Bank has filed a reply, the parties have submitted supplemental briefs on a discrete issue, and the court has heard oral argument. For the following reasons, the court submits to the district court the following

findings of fact and conclusions of law, pursuant to 28 U.S.C. §
157(c)(1), with the recommendation that the motion be granted in
part.  The court incorporates herein its original tentative
ruling, a copy of which is attached hereto as Exhibit A, except
where the original ruling conflicts with this ruling.[1]

In ruling on a Rule 12(b)(6) motion, a court "accept[s] as
true all facts alleged in the complaint, and draw[s] all
reasonable inferences in favor of the plaintiff."  al-Kidd v.
Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009), citing Newcal
Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1043 n.2
(9th Cir. 2008).  The court assesses whether the complaint
contains "sufficient factual matter, accepted as true, to 'state
a claim to relief that is plausible on its face.'"  al-Kidd, 580
F.3d at 949, citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949,
(2009), in turn quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,
570 (2007).

I.  The Statute of Repose

Based on its earlier tentative ruling and the supplemental
briefs of the parties, the court concludes that the seven-year
statute of repose for fraudulent transfer actions under
California law requires dismissal of Count 10 of the Amended
Complaint and dismissal of Count 9 as to the five obligations
incurred by IMG in favor of the Bank more than seven years before

---

1.  In its original ruling, the court indicated that if
Count 10 of the Amended Complaint were dismissed, that would
dispose of the entire action under Henry v. Lehman Commer. Paper,
Inc. (In re First Alliance Mortgage Company), 471 F.3d 977, 1008
(9th Cir. 2006).  For the reasons stated in these findings, the
court no longer believes that to be the case and the court does
not adopt that conclusion herein.

the commencement of IMG's chapter 11 case.[2]  As to the security
interests (Count 10), the issue boils down to three questions.
Could the Bank take a security interest in IMG's deposit accounts
to secure the repayment of future advances?  If so, was the
language of the parties' 2007 Business Loan Agreement sufficient
to create a security interest?  And finally, if so, did that
security interest have priority over the holder of an unsecured
creditor under California law, in whose shoes the trustee stands
under § 544(b)(1) of the Bankruptcy Code?  The court answers all
three questions in the affirmative.

The first and third questions are readily answered and the
trustee appears to concede them.  Under the UCC, "[a] security
agreement may provide that collateral secures . . . future
advances . . . ."  Cal. Comm. Code § 9204(c).  As to the priority
of the Bank's security interest in deposit accounts with the
Bank, perfected by the Bank's control of those accounts, on the
one hand, and the interest of an unsecured creditor, on the other
hand, the Bank's supplemental brief walks through the relevant
UCC sections and the court adopts that analysis herein.  This
leaves the second question – the sufficiency of the parties' 2007
Business Loan Agreement.  The trustee argues that "the Business
Loan Agreement is not sufficiently clear, as a matter of law, to
create a valid and enforceable security interest under the UCC

---

2.   The Bank has tangentially mentioned the four-year
statute of limitations of Cal. Civ. Code § 3439.09(a); however,
the Bank did not request relief based squarely on that statute
and the parties' briefs are not sufficient on the issue to permit
a ruling.  The Bank's arguments concerning the one-year "delayed
discovery" rule (§ 3439.09(a)(1)) are more suited to a motion for
summary judgment than a motion to dismiss.

1  with respect to future loans." Trustee's Supp. Opp., DN 135, at
2  1:24-25. The trustee cites sample form sources for her
3  conclusion that a valid security interest securing future
4  advances "is normally accomplished through the inclusion of a
5  specific future advance clause" (id. at 2:3-4, citing Uniform Law
6  Annotated, Uniform Commercial Code Forms and Materials and West's
7  Legal Forms), and suggests the Business Loan Agreement is invalid
8  because it does not include such a standard clause and does not
9  contain the words "future advances." She cites no authority,
10 however, for the proposition that such a standard clause or the
11 use of the words "future advances" is required to create a valid
12 security interest securing future advances.

13      In the trustee's view, getting to the notion of future
14 advances in the Business Loan Agreement "requires drilling down
15 through three layers of definitions set forth in the entirely
16 separate 'Definitions' section of the [agreement]." Trustee's
17 Supp. Opp. at 2:16-17. The court is not sure what is meant by
18 the suggestion that the Definitions section of the agreement is
19 "entirely separate." It is unequivocally part of the agreement.
20 In any event, however, the court does not consider the analysis
21 to be complex or convoluted, as the trustee suggests, but rather,
22 not uncommon for commercial loan documents. The agreement itself
23 (not the Definitions section) begins with these statements:

24         Borrower understands and agrees that:  (A) in
           granting, renewing, or extending any Loan,
25         Lender is relying upon Borrower's
           representations, warranties, and agreements
26         as set forth in this Agreement; (B) the
           granting, renewing, or extending of any Loan
27         by Lender at all times shall be subject to
           Lender's sole judgment and discretion; and
28         (C) all such Loans shall be and remain

                              - 4 -

1
2
> subject to the terms and conditions of this
> Agreement.
>
> TERM.   This Agreement shall be effective as
> of February 20, 2007, and shall continue in
> full force and effect until such time as <u>all
> of Borrower's Loans</u> in favor of Lender have
> been paid in full, including principal,
> interest, [etc.], or until such time as the
> parties may agree in writing to terminate
> this Agreement.

3
4
5
6

7  Bank's Ex. F-2, DN 90, at p. 1 (emphasis added).  These initial

8  provisions, together with the language by which IMG granted the

9  Bank a security interest in IMG's deposit accounts at the Bank

10 and the definitions in the Definitions section of the agreement,

11 discussed below, were sufficient to create in favor of the Bank a

12 security interest securing future advances.

13      The Business Loan Agreement includes this grant of a

14 security interest:  "Borrower hereby grants a security interest

15 to Lender in any and all deposit accounts (checking, savings,

16 money market or time) of Borrower at Lender, now existing or

17 hereinafter opened, to secure the Indebtedness."  Bank's Ex. F-2

18 at p. 4.[3]  The agreement defines "Indebtedness" as "the

19 indebtedness evidenced by the Note or Related Documents,

20 including all principal and interest . . . for which Borrower is

21 responsible under this Agreement or under any of the Related

22 Documents."  <u>Id.</u> at 6.  "Note," in turn, means "the Note executed

23 by [IMG] in the original principal amount of $250,000.00 dated

24 July 14, 2005, together with all renewals of, extensions of, . .

25 . and substitutions for the Note or Credit Agreement or <u>any other</u>

26
27
> 3.   Under the UCC, with exceptions not applicable here, "[a]
> security agreement may create or provide for a security interest
> in after-acquired collateral."  Cal. Comm. Code § 9204(a).

28

1  subsequent Notes evidencing future indebtedness." Id. at p. 6

2  (emphasis added). "Related Documents" means "all promissory

3  notes, credit agreements, loan agreements, . . . security

4  agreements, . . . and all other instruments, agreements and

5  documents, whether now or hereafter existing, executed in

6  connection with the Loan." Id. at 7 (emphasis added). Finally,

7  "Loan" means "any and all loans and financial accommodations from

8  Lender to Borrower whether now or hereafter existing, and however

9  evidenced . . . ." Id. at 6 (emphasis added).[4]

10       Despite these references to "any other subsequent Notes

11  evidencing future indebtedness," to "all promissory notes, credit

12  agreements, loan agreements, and security agreements, whether now

13  or hereafter existing," and to "any and all loans whether now or

14  hereafter existing," and despite the references in the opening

15  paragraphs of the agreement to "any Loan," "all such Loans," and

16  _____

17       4.   The trustee cites State Bank of Toulon v. Covey (In re
    Duckworth), 2012 Bankr. LEXIS 1219, 2012 WL 986766, *6 (Bankr.
18  C.D. Ill. March 22, 2012), in which the court considered an
    identical definition of "Indebtedness" and an almost identical
19  definition of "Related Documents," and concluded the definitions
    were circular because the former referred to the latter and the
20  latter to the former. See 2012 Bankr. LEXIS at *18-19. The case
    is distinguishable for at least two reasons. First, whereas in
21  Duckworth, "Related Documents" meant "all documents executed in
    connection with the Indebtedness," here, it means "all documents
22  executed in connection with the Loan," the term "Loan" being
    defined here as "any and all loans . . . whether now or hereafter
23  existing." (In Duckworth, "Loan" was not mentioned as a defined
    term.) Second, although "Indebtedness" in both Duckworth and the
24  present case means "the indebtedness evidenced by the Note or
    Related Documents," the definition of "Note" in Duckworth
25  included only "the Note . . . dated December 13, 2008" (and
    renewals, extensions, and so on), whereas in this case, "Note"
26  means "the Note . . . dated July 14, 2005 . . . or any other
    subsequent Notes evidencing future indebtedness." The trustee's
27  citation of Marques v. Bank of Am., N.A. (In re Marques), 2008
    Bankr. LEXIS 4921, 2008 WL 4286998, *7 (Bankr. E.D. Pa. Sept. 16,
28  2008), fails for the same reason. See 2008 Bankr. LEXIS 4921, at
    *24-25.

"all of Borrower's Loans" as being subject to the terms of the agreement, the trustee contends a lay person borrower "would have no idea that the clause purportedly granting a security interest could apply to future obligations" (Trustee's Supp. Opp. at 2:27-28) without some unusual mental gymnastics.  The court need not decide the issue because, first, the trustee cites no authority that the court is to construe the agreement through the eyes of a hypothetical lay person, and second, IMG was no lay person.  As the complexity of Deepal Wannakuwatte's Ponzi scheme, as alleged in the Amended Complaint, evidences, IMG was a sophisticated borrower chargeable with understanding the Business Loan Agreement as creating a security interest in the Bank's favor in all of IMG's accounts at the Bank to secure all loans, including future loans, made by the Bank to IMG, including those made within the seven years prior to the petition date.

The trustee contends the parties' course of conduct was inconsistent with the conclusion that the Business Loan Agreement was intended to cover future advances.  The trustee cites the fact that the parties entered into a similar "Business Loan Agreement" each time a new loan was made.  She concludes the parties would not have done that if they had believed the February 2007 Business Loan Agreement was sufficient to secure the new loans.  The argument is unpersuasive.  First, the court views it as not uncommon for a lender to require new loan documents each time a new loan is made, and this is merely a reflection of the lender trying to cover all of its bases.  Second, the February 2007 Business Loan Agreement defines the "Agreement" as "this Business Loan Agreement, as this Business

1 Loan Agreement may be amended or modified from time to time . . .
2 ."  Bank's Ex. F-2 at p. 6.  Each Business Loan Agreement also
3 included a statement that it "amends and restates" the prior one.
4 For example, the Business Loan Agreement the court has referred
5 to throughout this ruling states, "This Business Loan Agreement
6 amends and restates the prior Business Loan Agreement dated
7 February 5, 2007, as amended from time to time."  Id. at p. 5.
8 Thus, the additional Business Loan Agreements were not separate
9 agreements at all; they were merely amendments to the original
10 one.  The trustee's conclusion that the additional agreements
11 reflected an understanding that the original one did not cover
12 future advances fails.

13     Finally, the trustee contends "a future advance clause or
14 dragnet clause is only enforceable under California law to the
15 extent that the language of the security agreement and the
16 parties' conduct establishes a clear understanding on the part of
17 both parties that the security interest will secure other
18 obligations.  There is no such clarity here."  Trustee's Supp.
19 Opp. at 4:13-16.  The trustee cites three cases for the
20 proposition that the critical question is the intent of the
21 parties.  See Fischer v. First Internat. Bank, 109 Cal. App. 4th
22 1433, 1445 (2003); In re Kim, 256 B.R. 793, 796 (Bankr. S.D. Cal.
23 2000); New West Fruit Corp. v. Coastal Berry Corp., 1 Cal. App.
24 4th 92, 99 (1991)).  The Kim court held that intent is to be
25 determined by tests it called the 'relationship of loan' and
26 'reliance on the security' tests (see Kim, 256 B.R. at 797); that
27 is, by whether the two loans relate to each other and whether the
28 creditor made the second loan in reliance on the original

- 8 -

1   security.  Id. at 798.[5]  Citing Cal. Comm. Code § 1201(b)(3),[6] the

2   court in New West Fruit held that intent is to be determined by

3   reference to the parties' language or course of performance,

4   course of dealing, or usage of trade.  1 Cal. App. 4th at 99.

5        In the court's view, these are the types of issues that must

6   have necessarily been raised in a challenge to the validity or

7   enforceability of a security interest before the expiration of

8   the statute of repose.  That is, they are questions a statute of

9   repose and probably the less harsh statute limitations as well

10  are designed to preclude.  Neither Kim nor New West Fruit

11  involved a challenge to a security interest after the statute of

12  repose had expired.  2002 Cal. App. Unpub. LEXIS 7478.  Nor did

13  the third case cited by the trustee, Fischer v. First Internat.

14  Bank, 109 Cal. App. 4th 1433 (2003).[7]

15

16       5.   The use of those tests was rejected with the 2001
    revisions to the UCC.  See Frontier Fin. Credit Union v. Dumlao
17  (In re Dumlao), 2011 Bankr. LEXIS 4315, *13-15 (9th Cir. BAP Aug.
    5, 2011); Kim, 256 B.R. at 797, n.4.
18

19       6.   "'Agreement,' as distinguished from 'contract,' means
    the bargain of the parties in fact, as found in their language or
20  inferred from other circumstances, including course of
    performance, course of dealing, or usage of trade as provided in
21  Section 1303."  Cal. Comm. Code § 1201(b)(3).

22       7.   That case is distinguishable in any event from the
    present case in that it concerned a "dragnet" clause in a
23  consumer deed of trust on the borrower's residence, not a
    security agreement governed by the UCC.  "Because a dragnet
24  clause is one of the provisions 'least likely' to be understood
    by a layperson reading the fine print of a deed of trust,
25  California limits the enforcement of such a provision 'to those
    transactions where objective evidence discloses the intention of
26  the debtor and the creditor to enlarge the lien to include other
    obligations.'"  109 Cal. App. 4th at 1445 (citation omitted).
27  The trustee has cited no authority for the proposition that
    similar considerations apply to security agreements under the UCC
28  and no persuasive argument for the position that such
    considerations should apply.

- 9 -

1    For the reasons discussed above, the court concludes that

2  Count 10 of the Amended Complaint should be dismissed in its

3  entirety because the security interests granted by way of the

4  February 20, 2007 Business Loan Agreement were granted outside

5  the seven-year period of the statute of repose, and therefore,

6  are not subject to attack.  This ruling applies to the security

7  interests securing all of the Bank's loans to IMG, including, as

8  a result of the future advances language, those made within the

9  seven-year period.[8]  The ruling also applies to Count 9 as to

10 IMG's obligations incurred more than seven years prior to the

11 commencement of the chapter 11 case; as to those five

12 obligations, Count 9 should be dismissed.  Similarly, Counts 1, 2

13 and 4 should be dismissed with respect to repayments made to the

14 Bank on loans made to IMG outside the seven-year period, as those

15 repayments were made from the Bank's own collateral, and thus,

16 under First Alliance Mortgage, they are not subject to attack.

17 In short, as to Count 10, as to those portions of Count 9

18 concerning obligations incurred outside the seven-year period,

19 and as to those portions of Counts 1, 2, and 4 concerning

20 repayments on those obligations, accepting as true all facts

21 alleged in the Amended Complaint and drawing all reasonable

22 inferences in favor of the trustee, the court concludes that when

23 viewed in light of the seven-year statute of repose of Cal. Civ.

24 ———————————————

25    8.  To be clear, the ruling applies to the security
   interests securing all of the Bank's loans, even the loans made
26 within the repose period, and the trustee may not attack the
   security interests themselves.  As discussed below, however, the
27 trustee may attack one or more of the loans themselves – the
   loans made within the repose period, and as to those avoided, if
28 any, the security interests, although not subject to attack, will
   be found to be inapplicable.

1  Code § 3439.09(c), the complaint does not contain "sufficient
2  factual matter, accepted as true, to 'state a claim to relief
3  that is plausible on its face.'"   The trustee has suggested no
4  way in which she could, by amendment to the complaint, overcome
5  the statute of repose with respect to the security interests or
6  those five obligations; thus, amendment would be futile, and the
7  trustee's request for leave to amend should be denied.   See
8  Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1051 (9th Cir.
9  2008).

10      Finally, however, the trustee contends that even if the
11  seven-year statute of repose would otherwise dictate dismissal of
12  Count 10 - the claim to avoid the security interests, Count 9
13  salvages the situation.   The argument is premised on what the
14  trustee calls "the black letter principle of law that a security
15  interest or lien is of no legal effect in the absence of an
16  underlying, valid and enforceable obligation."   Trustee's Opp. at
17  21:2-4.   Thus, in the trustee's view, "Count 9 paves the way for
18  the Trustee to avoid transfers to [the Bank] by eliminating an
19  essential condition necessary for a security interest to be valid
20  and enforceable."   Id. at 2:22-23.   As to those obligations
21  incurred within the seven-year period, the court agrees, although
22  the court would phrase the issue slightly differently.[9]   As to

_____

24      9.   As to the obligations incurred within the seven-year
    period, the court agrees that if the trustee is successful in
25  avoiding those obligations under Count 9, she may then seek to
    avoid the repayments of those obligations under Counts 1, 2, and
26  4.   The trustee's phrasing is, however, not particularly helpful.
    By referring to a "condition necessary for the security interest
27  to be valid and enforceable," the trustee suggests she will be
    attacking the security interest, which the court has already
28  determined is immune from attack because of the statute of
                                              (continued...)

the obligations incurred outside the seven-year period, the court
disagrees, because those obligations are themselves immune from
attack under the statute of repose.

The trustee is correct that with respect to the obligations
incurred within the seven years prior to the filing of the
chapter 11 case, the statute of repose does not apply.  This is
because, as the trustee argues, a creditor must be owed a valid
and enforceable obligation before it may enforce a security
interest, even a security interest that is valid with respect to
future advances.  In other words, if the obligation incurred on
account of the future advance fails, the security agreement
providing for security for the future advance is left with
nothing to secure.  As the trustee phrases it, "[a] secured party
has no rights to a debtor's assets above and beyond the amount
that is owed."  Trustee's Supp. Opp. at 1:14-15.

The Bank argues that "[e]ven if those obligations [the ones
incurred within the seven-year period] were hypothetically
avoidable . . . , the liens on the IMG Deposit Accounts would not
evaporate automatically – they would still need to be avoided.
But under the 7-year statute of repose and its effect on Count 10
pursuant to the subsequent advance clauses in the 2/20/2007
[Business Loan Agreement], it is simply too late to avoid these
liens."  Bank's Supp. Brief, DN 133, at 3:14-19.  The Bank is not
correct that if the trustee succeeds in avoiding the obligations

_____

9. (...continued)
repose.  The question is not whether the avoidance of the
obligations would give rise to a basis for avoiding or otherwise
attacking the validity or enforceability of the security
interest.  The question is whether avoided obligations are within
the scope of the obligations secured by the security interest.

incurred within the seven-year period, she would then also have
to avoid the security interest purporting to secure those
obligations.  This is because there would simply be no such
obligations.

By way of the Business Loan Agreement, as quoted above, IMG
granted the Bank a security interest in its deposit accounts "to
secure the Indebtedness," and "the Indebtedness" is defined as
"the indebtedness evidenced by the Note or Related Documents,
including all principal and interest . . . for which Borrower is
responsible under this Agreement or under any of the Related
Documents."  If the obligations are avoided, as the trustee seeks
in Count 9, the responsibility for those obligations is avoided
and, insofar as those particular loans are concerned, there is no
"Indebtedness" for the security interest to secure.[10]  If the
trustee prevails on her Count 9 as to one or more of the
obligations, the obligations will be in essence nullified, with
the result that the Bank, because it was repaid all of its loans,
will have been overpaid.

The Bank argued at the second hearing that all the funds in
the deposit accounts were at all times the Bank's collateral,

---

10.  The Bank makes much of its alleged statutory banker's
lien, as well as a common law right of setoff.  In recommending
the dismissal of Count 10, the court rejects the trustee's
challenge to the Bank's contractual lien and the contractual lien
stands as valid and enforceable.  To the extent the Bank prevails
on the trustee's Count 9 and the obligations are determined to be
valid and enforceable, this ruling determines that the
contractual lien securing them cannot be challenged by the
trustee and the Bank will not need to rely on its banker's lien
or right of setoff.  Further, the Bank has offered no authority
for the proposition that the banker's lien or the right of setoff
would have any more validity or enforceability than the
contractual lien as to underlying obligations found to be
avoidable.

whether that collateral secured one loan, five loans, or any
other number.  Therefore, the Bank reasons, each time a repayment
was made from that collateral, regardless of whether it was a
repayment on a valid loan or an arguably avoidable loan, since
the source of the repayment was the Bank's collateral, the Bank
was repaid - every time - from its own collateral, for the
purpose of applying <u>First Alliance Mortgage</u>.  However, this does
not mean the Bank is entitled to be paid more than it is lawfully
owed.

Finally, the Bank focused, both in its briefs and at oral
argument, on the Uniform Commercial Code definitions of
"transfer," "asset," "lien," and "valid lien," and especially, a
"transfer" as including the creation of a lien but not the
incurring of an obligation.  Emphasizing that § 550 of the
Bankruptcy Code provides for the recovery of a "transfer" but not
the recovery of an "obligation," the Bank concludes, even if the
trustee could avoid the obligations, under Count 9, she would be
unable to "recover" anything because there is no "transfer" to
recover, only an obligation.  The problem with the theory is that
if one or more of the obligations are avoided, the trustee would
be seeking, under Counts 1, 2, and 4, to recover the repayments
made on the avoided obligations, repayments that were without
question "transfers."

For the reasons stated, the court will recommend the motion
be denied as to Count 9 insofar as it pertains to the loans made
by the Bank to IMG within the seven years prior to the filing of
the chapter 11 case.

II.   Relation Back of Count 9 [11]

Citing § 546(a) of the Bankruptcy Code, the Bank contends Count 9 must be dismissed as having been filed more than two years after the petition date.  The trustee contends, on the other hand, the allegations in the Amended Complaint are sufficiently connected to those in the original complaint to permit the Amended Complaint to "relate back" to the original, for purposes of § 546(a).  "An amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading."  Fed. R. Civ. P. 15(c)(1), incorporated herein by Fed. R. Bankr. P. 7015.  The court is to find the necessary connection if "the claim to be added will likely be proved by the 'same kind of evidence' offered in support of the original pleadings.'"  Markus v. Gschwend (in Re Markus), 313 F.3d 1146, 1150 (9th Cir. 2002) (citations omitted). The critical issue is one of fair notice to the defendant. "Thus, amendment of a complaint is proper if the original pleading put the defendant on notice of the 'particular transaction or set of facts' that the plaintiff believes to have caused the complained of injury.  Fairness to the defendant demands that the defendant be able to anticipate claims that might follow from the facts alleged by the plaintiff."  Percy v. San Francisco General Hospital, 841 F.2d 975, 979 (9th Cir.

---

11.   The Bank raised this argument with respect to both Count 9 and Count 10.  However, because the court will recommend dismissal of Count 10 in its entirety based on the statute of repose, the court will limit this discussion to Count 9.

1 | 1988).

2 |     In this case, the Bank contends new Count 9 pertains to
3 | entirely different transactions from those alleged in the
4 | original complaint.  The Bank relies heavily on O'Cheskey v.
5 | CitiGroup Global Mkts., Inc. (In re Am. Hous. Found.), 543 B.R.
6 | 245 (Bankr. N.D. Tex. 2015), in which the court found a trustee's
7 | amended complaint to avoid allegedly fraudulent obligations did
8 | not relate back to his original complaint to avoid loan
9 | repayments.  543 B.R. at 262.  Specifically, the court found the
10 | amended complaint alleged "facts that differ in both time and
11 | type" from those in the original complaint and that the original
12 | complaint gave no notice of the trustee's intent to seek to avoid
13 | the underlying obligations.  Id.  Unlike in that scenario,
14 | however, the trustee's original complaint in the present case,
15 | although it did not purport to state a claim to avoid the
16 | underlying obligations, did set forth in extensive detail factual
17 | allegations about the banking relationship between IMG and
18 | Wannakuwatte, on the one hand, and the Bank, on the other, from
19 | the very inception of the relationship.  In contrast, in
20 | O'Cheskey, "the [original] complaint [made] no reference to a
21 | relationship between [the debtor and the defendant] beyond two
22 | years prior to the petition date."  543 B.R. at 262.

23 |     In the present case, the original complaint set forth
24 | virtually all of the factual allegations that are now summarized
25 | in Count 9.  In other words, Count 9 did nothing more than add a
26 | theory of relief based on the same transactions and other factual
27 | circumstances alleged in the original complaint.  The Bank
28 | complains that the original complaint did not give the Bank any

1   indication the trustee would seek to avoid the underlying

2   obligations.  However,

> Rule 15 does not require that a pleading give notice of
> the exact scope of relief sought.  Rather, it must give
> fair notice of the transaction, occurrence, or conduct
> called into question.  So long as a party is notified
> of litigation concerning a particular transaction or
> occurrence, that party has been given all the notice
> that Rule 15(c) requires.  When a defendant is so
> notified, the defendant knows that the whole
> transaction described in it will be fully sifted, by
> amendment if need be, and that the form of the action
> or the relief prayed or the law relied on will not be
> confined to their first statement.

10  Asarco, LLC v. Union Pac. R.R. Co., 765 F.3d 999, 1006 (9th Cir.

11  2014) (citations omitted).  The trustee's original complaint

12  included many allegations about IMG's conduct as regards the Bank

13  and Bank's conduct toward IMG, from and including the times the

14  various promissory notes were signed.  Thus, the court has no

15  hesitation in concluding that the Bank had fair notice of the

16  possibility the trustee would assert claims for relief arising

17  out of those factual allegations, and the amended complaint

18  relates back to the date of the original one.

19  III.  The Bank's Arguments re Count 9

20      The Bank makes a number of arguments for the dismissal of

21  the trustee's Count 9 – the cause of action in which she seeks to

22  avoid the underlying obligations of IMG to the Bank.  First, the

23  Bank contends the sole remedy available to a trustee upon

24  avoidance of an obligation, as opposed to avoidance of a

25  transfer, is that the obligation will be disallowed as a claim

26  against the estate.  Thus, because IMG's obligations to the Bank

27  were all repaid prior to the filing of the petition and are no

28  longer "extant," to use the Bank's term, there is no remedy

available to the trustee.  The Bank cites several cases and
treatises suggesting the remedy for the avoidance of an
obligation is the disallowance of the obligation as a claim
against the estate and that the obligation is not deemed void for
all purposes.  The Bank highlights this language from a comment
to the Uniform Voidable Transactions Act ("UVTA"):  "'Avoidance'
is a term of art in this Act, for it does not mean that the
transfer or obligation is simply rendered void . . .
'[A]voidance' of an obligation under subsection (a)(1) likewise
should not mean its cancellation, but rather a remedy that
recognizes the existence of the obligation and the superiority of
the plaintiff creditor's claim against the debtor") (emphasis
added)."  Bank's Memo. at 45:9-13, quoting UVTA, § 7, cmt. 7
(2014).

It may be that in some situations, the disallowance of the
obligation as a claim against the estate will be the only
practical consequence of avoiding the obligation.  Here, however,
there is an additional logical consequence:  avoidance of the
obligations incurred by IMG to the Bank would mean the repayments
made on those obligations – the payments the trustee seeks to
avoid and recover in Counts 1, 2, and 4 – were repayments on
invalid and unenforceable obligations; that is, obligations not
covered by the future advances language in the Business Loan
Agreement.  If the obligations are avoided, IMG simply would have
paid the Bank more than it was lawfully entitled.

The trustee cites language in comment 7 to the UVTA that was
omitted in the Bank's quotation, cited above.  As quoted by the
trustee, immediately following the language about the

1  "superiority of the plaintiff creditor's interest over the
2  obligee's interest," the comment states:  "That [avoidance of the
3  obligation] would entail disgorgement by the obligee of any
4  payments received or receivable on the obligation, to the extent
5  necessary to satisfy the plaintiff creditor's claim, with the
6  obligee being subrogated to the plaintiff creditor when the
7  latter's claim is paid."  Trustee's Opp. at 32:4-6, quoting UVTA,
8  § 7, cmt. 7.  The trustee also quotes Collier:  "[I]f the court
9  avoids an obligation under section 548 or it is otherwise not
10  binding on the debtor, transfers made by the debtor on account of
11  that obligation are not made for reasonably equivalent value, and
12  may be set aside as actually or constructively fraudulent if the
13  other requirements for actual or constructive fraud are met."
14  Id. at 32:22-33:1, quoting 5 Collier on Bankruptcy ¶
15  548.03[4][a], (Alan N. Resnick & Henry J. Sommer eds., 15th ed.
16  2015).

17      If the trustee succeeds in avoiding the incurring of the
18  obligations themselves as fraudulent obligations, which is what
19  the trustee is trying to do in Count 9, the obligations will be
20  rendered invalid and unenforceable, and repayments made on those
21  obligations may similarly be avoidable and/or recoverable, which
22  is what the trustee is seeking in Counts 1, 2, and 4.  If the
23  trustee does not succeed in avoiding the obligations, the
24  obligations will be subject to the future advances language in
25  the Business Loan Agreement, and therefore, repayments on those
26  obligations will not be subject to attack, under First Alliance
27  Mortgage.
28  / / /

1        The Bank cites two cases holding that a transfer of property
2   that has already been reversed by the parties to the transfer
3   cannot subsequently be avoided by a creditor of the transferor
4   under California fraudulent transfer law.  See Kelleher v.
5   Kelleher, 2015 U.S. Dist. LEXIS 131723, *24 (N.D. Cal. 2015).
6   The theory is that the "reversal" of the transfer by the original
7   parties put them back in their original positions – a "no harm,
8   no foul" argument.  See id.; see also Lassman v. Patts (In re
9   Patts), 470 B.R. 234, 243 (Bankr. D. Mass. 2012) ["Simply stated,
10  the transfer the Trustee seeks to avoid has already been undone
11  and the undiminished value of the transferred asset has been
12  restored to the bankruptcy estate.  Accordingly, any 'recovery'
13  for the benefit of the estate has already been completed, albeit
14  by the Debtor and Patts."].  The Bank posits that, as in those
15  cases, when IMG repaid the Bank, the obligations the trustee
16  seeks to avoid in Count 9 were extinguished or "reversed,"
17  leaving nothing for the trustee to avoid.  However, if the
18  trustee is successful in avoiding the obligations, via Count 9,
19  this means the Bank has been overpaid or paid more than it was
20  lawfully due.

21       The Bank also argues the trustee cannot avoid the
22  obligations (Count 9) because IMG received from the Bank loan
23  proceeds equivalent to the amount of the debt it incurred, and
24  therefore, IMG's balance sheet remained neutral.  However, again,
25  if the obligations are avoided, the Bank was overpaid.  This is
26  something the Bank overlooks in most of these arguments.
27  Further, the argument is not appropriate in the context of a Rule
28  12(b)(6) motion, which serves only to test the pleadings, and

1  especially not appropriate where, as here, the plaintiff alleges

2  actual fraudulent transfers.  In an actual fraudulent transfer

3  case, as opposed to a constructive fraudulent transfer case, the

4  plaintiff does not have the burden, as part of its case-in-chief,

5  of proving the debtor did not receive a reasonably equivalent

6  value in exchange for the transfer (compare § 3439.04(a)(1) with

7  (a)(2) and § 3439.08(a)), although that is one of the many

8  factors the court may consider in determining whether the

9  transfer was made with actual intent to defraud creditors.  See

10  3439.04(b) (non-inclusive list) and (b)(8).  Instead, reasonably

11  equivalent value is part of a two-part defense the defendant may

12  offer, the other being that the defendant took the transfer in

13  good faith.  § 3439.08(a).[12]

14      Finally, the Bank raised certain arguments for the first

15  time in its reply to the trustee's opposition, including

16  arguments concerning the in pari delicto doctrine, the statute of

17

18      12.  The Bank emphasizes that in First Alliance Mortgage,
19  the Ninth Circuit held the trustee could not recover as
    fraudulent transfers payments made on secured debts despite a
20  jury's earlier finding, affirmed by the circuit court, that the
    defendant had aided and abetted the debtor's fraud practiced on
21  the debtor's borrowers.  471 F.3d at 1009.  However, the court
    reached this conclusion after a bench trial on the fraudulent
22  transfer claims, not on a motion to dismiss, and based on factual
    findings that "there was no defrauding of creditors (or
23  borrowers) by entering into the [loan agreement between the
    debtor and its lender], with intent or otherwise."  Id. at 1008.
24  "The district court found that [the debtor] perpetrated a fraud
    by making misrepresentations in the sales pitch for the loans.
25  The [loan agreement] had nothing to do with those
    misrepresentations, and the Trustee's efforts to conceptually
26  collapse the 'obligation incurred' by [the debtor] into its
    fraudulent mortgage loans to borrowers is unconvincing."  Id. at
27  1008-09.  At this stage, the court has made no factual findings
    in this adversary proceeding that might support such a conclusion
28  and it would be inappropriate for the court to do so on this
    motion to dismiss.

1  limitations on contract claims, and California law on the duty of
2  banks as regards the wrongdoing of their depositors.   The
3  arguments are directed at the trustee's ability or inability to
4  challenge the validity of the "Loan Documents," apparently the
5  documents evidencing the Bank's loans to IMG.   It is not clear to
6  the court how those arguments pertain in an action to avoid
7  fraudulent transfers and fraudulent obligations, but in any
8  event, as they were not raised initially, the trustee has not had
9  an opportunity to address them and the court will not consider
10  them further.

11      For the reasons stated, the court submits these findings of
12  fact and conclusions of law to the district court with the
13  recommendation that the motion be granted in part and that Count
14  10 of the Amended Complaint be dismissed, that Count 9 be
15  dismissed as to the five obligations incurred by IMG in favor of
16  the Bank more than seven years before the commencement of IMG's
17  chapter 11 case, and that Counts 1, 2 and 4 be dismissed with
18  respect to repayments made to the Bank on loans made to IMG
19  outside the seven-year period.

20  Dated: December **6**, 2016         *Robert Bardwil*
21                                      ROBERT S. BARDWIL
22                                      United States Bankruptcy Judge

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
CIVIL MINUTES

---

**Case Title :**   INTERNATIONAL
MANUFACTURING GROUP, INC.
MCFARLAND V. CALIFORNIA
BANK & TRUST ET AL

**Case No :**   **14-25820-D-11**
**AdvL**   **16-2090**
**Date :**   10-19-16
**Time :**   10:00 A.M.

**Matter :**   [85] MOTION TO DISMISS ADVERSARY PROCEEDING [BN-2]

**Judge :**   **Robert Bardwil**
**Courtroom Deputy :**   Nancy Williams
**Reporter :**   **DIAMOND REPORTERS**
**Department :**   **D**

---

**APPEARANCES for:**
**Movant(s) :**
ATTORNEY JOEL SAMUELS, ATTORNEY ROBERT ADDISON [PHONE],
ATTORNEY ANTHONY NAPOLIATAN [PHONE] FOR DEFENDANT
**Respondent(s) :**
ATTORNEY CHRISTOPHER SULLIVAN FOR PLAINTIFF

---

**CIVIL MINUTES**

**CONTINUED TO 11-30-16 AT 10:00 A.M.**

**SUPPLEMENTAL EVIDENCE: 11-9-16**

Tentative ruling:

This is the motion of defendant ZB, N.A. (the "Bank") to dismiss the first amended complaint ("Amended Complaint") of the plaintiff, Beverly McFarland, who is also the trustee in the chapter 11 case in which this adversary proceeding is pending (the "trustee"), pursuant to Fed. R. Civ. P. 12(b)(6), made applicable in this proceeding by Fed. R. Bankr. P. 7012(b), for failure to state a claim upon which relief can be granted. The trustee has filed opposition and the Bank has filed a reply. For the following reasons, the court intends to continue the hearing to permit limited additional briefing.

The court notes initially that the Bank has not filed a proof of

Exhibit A

claim in the underlying chapter 11 case and does not otherwise consent
to this court's jurisdiction to render a final judgment in this
adversary proceeding or to make a final determination of this motion.
Thus, pursuant to Exec. Benefits Ins. Agency v. Arkison (In re
Bellingham Ins. Agency, Inc.), 702 F.3d 553 (9th Cir. 2012), aff'd,
Exec. Benefits Ins. Agency v. Arkison, 134 S.Ct. 2165, 2175, 189 L.
Ed. 2d 83 (2014), the court will submit findings of fact and
conclusions of law, together with its recommendation, to the district
court.  The Bank notes that it reserves the right to file a motion to
withdraw the reference of this adversary proceeding.  In the interest
of judicial economy, the court intends to impose a deadline by which
either party may make such a motion or be deemed to have consented to
this court's jurisdiction to render a final judgment.

    The court finds there is an issue that has been addressed by both
parties, but not fully briefed, that may be dispositive of the motion,
depending on the court's decision on that issue.  The issue – whether
the seven-year statute of repose for fraudulent transfer actions under
California law requires dismissal of this action as against the Bank –
turns on the effect of a Business Loan Agreement entered into in 2007
between the debtor in the underlying chapter 11 case, International
Manufacturing Group, Inc. ("IMG") and the Bank.  Thus, the court must
initially determine whether it can consider the Business Loan
Agreement at all.  The trustee contends it cannot.

    In her original complaint, the trustee sought to avoid transfers
totaling more than $15 million made by IMG to the Bank as actual
fraudulent transfers, pursuant to § 544(b) of the Bankruptcy Code and
Cal. Civ. Code § 3439.04 (Count 1 as to payments of principal and
Count 2 as to payments of interest and fees), to recover the value of
the transfers pursuant to § 550 of the Bankruptcy Code (Count 4), and
to disallow the Bank's claims filed in the chapter 11 case of IMG's
principal, Deepal Wannakuwatte (Count 8).  The Bank filed a motion to
dismiss the complaint for failure to state a claim upon which relief
could be granted.  The crux of the motion was that all of the
transfers were made from funds in IMG deposit accounts at the Bank,
funds in which the Bank had a perfected security interest, such that
the payments did not deplete assets that would otherwise have been
available to the bankruptcy estate when the chapter 11 case was filed.
Thus, under Henry v. Lehman Commer. Paper, Inc. (In re First Alliance
Mortgage Company), 471 F.3d 977, 1008 (9th Cir. 2006), the Bank
claimed the payments simply did not constitute fraudulent transfers.
The Bank reiterates this argument in its motion to dismiss the Amended
Complaint.

    The trustee does not seriously contest the argument.[1]  Instead,
she claims the two new counts she has added against the Bank in her
Amended Complaint – Counts 9 and 10 – render the argument irrelevant.
In the two new counts, the trustee seeks to avoid IMG's underlying
obligations to the Bank – the obligations arising out of the loans
made by the Bank to IMG (the loans on account of which the transfers
originally alleged were made) (Count 9) and to avoid any purported

liens or security interests given by IMG to the Bank to secure the
loans (Count 10).  The trustee contends that if she can avoid the
obligations, then they were invalid, the security interests purporting
to secure them were also invalid, and the Bank was not a secured
creditor to begin with.  Thus, the fact that the Bank was repaid from
funds held in IMG's accounts at the Bank does not mean the Bank was
repaid from its own collateral, because there never was any such
collateral.

    As a component of this theory, the trustee would preclude the
court from considering the loan documents executed between IMG and the
Bank, including the Business Loan Agreement, which are central to the
Bank's position.  The holding of <u>First Alliance Mortgage</u> on which the
Bank relies is this:

> [r]epayments of fully secured obligations--where a transfer
> results in a dollar for dollar reduction in the debtor's
> liability--do not hinder, delay, or defraud creditors
> because the transfers do not put assets otherwise available
> in a bankruptcy distribution out of their reach.  The
> payments made to Lehman under its agreement with First
> Alliance were simply not fraudulent transfers within the
> meaning of the statute.

<u>First Alliance Mortgage</u>, 471 F.3d at 1008 (citation omitted, internal
quotation marks omitted).  Thus, obviously, the Bank's position relies
on the loan documents executed between IMG and the Bank to demonstrate
the existence of "fully secured obligations."  The Bank seeks to
introduce those documents, under the doctrine that a court may look
beyond the pleadings on a Rule 12(b)(6) motion and consider "documents
incorporated into the complaint by reference."  <u>Daniels-Hall v. Nat'l
Educ. Ass'n</u>, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted).  A
document not attached to the complaint may be considered if  "(1) the
complaint refers to the document; (2) the document is central to the
plaintiff's claim; and (3) no party questions the authenticity of the
copy attached to the 12(b)(6) motion."  <u>Id.</u>

    The trustee does not question the authenticity of the copies of
the loan documents, loan transaction history reports, and bank
statements submitted by the Bank with its motion.  She contends,
however, that the complaint does not refer to the documents and they
are not central to her claims.  She cites <u>Ecological Rights Found. v.
Pac. Gas & Elec. Co.</u>, 713 F.3d 502 (9th Cir. 2013), in which the court
stated that "[w]hether a document is 'central' to a complaint turns on
whether the complaint 'necessarily relies' on that document."  713
F.3d at 511.  Ironically, in that case, it was the plaintiff who
sought to introduce, in opposition to a motion to dismiss, documents
it had not attached to its complaint.  The court determined the
plaintiff had not alleged in its complaint a particular type of
discharge of contaminated stormwater into the environment, and could
not rely on notice letters it had sent the defendant before filing the
complaint which, arguably, contained such allegations.  <u>Id.</u>  The court

found the complaint "did not refer 'extensively' to those notices and they were not integral to [the] complaint." Id.

In contrast, in Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010), the court held to be central to the plaintiff's complaint a billing agreement under which the defendant alleged  it retained certain funds as reserves against bad debts.  The plaintiff alleged in its complaint the defendant had converted the funds, but the complaint did not expressly refer to the billing agreement.  The court held that "[w]hether or not [the defendant] converted the reserves it received from the [plaintiff's] customers . . . depends in large part on its authorization to do so and whether it asserted ownership over the funds at that time--suggesting that the Billing Agreement is integral to the Amended Complaint." Id.

In this case, the trustee's original complaint clearly made sufficient reference to the loan documents, loan transaction histories, and bank statements to enable the court to consider them under the "incorporation by reference" doctrine.  (And the Amended Complaint includes all the allegations in the original complaint.) The original complaint referred to "financing transactions that provided the necessary liquidity for Deepal Wannakuwatte . . . to get his then fledgling Ponzi scheme off the ground."  Trustee's Compl., DN 1, at 1:5-7.  It referred extensively to standby letters of credit alleged to have constituted collateral for the Bank's loans to IMG, letters of credit the complaint alleged were used by Wannakuwatte "to obtain approximately $24 million from [the Bank] through various credit facilities between [the Bank] and IMG." Id. at 2:23-24.

The complaint described the manner in which the Bank provided loan advances to IMG and referred to IMG's bank accounts at the Bank having "functioned as a commingled common pot of cash from which interest and principal payments [were] made on existing promissory notes." Id. at 8:26-27.  It also referred to "[the Bank's] unusual and wide-ranging banking relationship with IMG and Wannakuwatte" (at 9:20-21), to IMG and Wannakuwatte having "in excess of thirty different checking accounts established with CBT and well over ten substantial lines of credit or loans with CBT" (at 9:24-25), and to "frequent examples of substantial overdrafts and notices of bounced checks, countless examples of cash transactions involving huge dollar amounts, thousands of dollars of transactions involving the purchase of, or deposits of, cashier's checks, and rapid clearing of large (often millions of dollars) of checks, despite low, zero, or negative fund balances in the accounts used."  At 10:4-8.

The complaint described the Bank's involvement with the transactions involving the Jamestown S'Klallam Tribe, beginning with this allegation:  "IMG and CBT entered into Loan No. 168068-0004 on or about May 17, 2006 in the original amount of $1,500,000.00 (the 'JHMS Line')."  Compl., DN 1, at 17:7-9.  The complaint continued:  "Only forty-one days later, CBT and IMG agreed to increase the loan amount from $1,500,000.00 to $9,000,000.00 in a Change in Terms Agreement

dated June 26, 2006.  As part of the Change in Terms Agreement, the
'Acceptance Subline' was also increased to $9 million.  Such drafts
drawn on CBT for the benefit of IMG, termed 'acceptances,' could total
up to the full amount of the line, or $9 million." Id. at 17:10-14.
(The Bank points out that the Change in Terms Agreements referred to
in the complaint all incorporate the promissory notes and business
loan agreements for their respective transactions.)

       The complaint listed the loan advances made by the Bank on the
JHMS Line and described the manner in which they were made; it also
described various loan repayments made by IMG to the Bank and repeated
extensions of the maturity date of the JHMS line.  The complaint
included as an exhibit a long list, by loan number, date, and amount,
of IMG's alleged payments of interest and fees on the various loans [2]
and described by loan number, date, amount, and purported purpose the
various "loans" and "lines of credit" entered into between IMG and the
Bank.  The complaint did not specifically mention the loan documents
themselves except for various "Change in Terms Agreements," which were
listed by date and alleged to have been for the purpose of extending
the maturity dates of the various loans.  The complaint listed, by
loan number, date, and amount, the principal "repayments of loans" by
IMG to the Bank, totaling $12,782,752.  All of the above allegations
in the original complaint are also in the Amended Complaint.

       In light of all of these detailed allegations concerning the
"loans," loan advances, and loan repayments, the court finds
unreasonable and nonsensical the trustee's contention that the
complaint, and thus, the Amended Complaint does not "necessarily rely"
on the loans documents, loan histories, or bank statements, and thus,
that those documents are not central to her claims and should not be
considered on this motion.  The trustee argues that "none of [her]
claims are based on the underlying loan documents" (Trustee's Opp., DN
102, at 1:17-18), that her claims "stand on their own two feet, [and
do not] inherently depend on the existence or substance of the
underlying loan documents" (id. at 1:18-20), and that they "stand
independent of any references to any loan documents." Id. at 1:23.[3]
The court finds, to the contrary, that the trustee's many references
in the complaint to the credit facilities, the standby letters of
credit as collateral, the loans, lines of credit, loan advances, and
loan repayments, including "interest and principal payments made on
existing profmissory notes," and to the various Change in Terms
Agreements put the loan documents squarely in play.[4]

       Further, the allegations of "substantial overdrafts and notices
of bounced checks, countless examples of cash transactions involving
huge dollar amounts, thousands of dollars of transactions involving
the purchase of, or deposits of, cashier's checks, and rapid clearing
of large (often millions of dollars) of checks, despite low, zero, or
negative fund balances in the accounts used" put the loan histories
and bank statements in play.  Given all of those references, it would
be unfair and simply beyond the pale not to permit the Bank to cite
the loan documents themselves as evidence of a security interest in

the funds in IMG's bank accounts, the funds from which the transfers
were made.

In addition, if those references in the original complaint
(repeated in the Amended Complaint) were not enough, new Counts 9 and
10 unequivocally invoke the loan documents.  Count 9 states that "IMG
and [the Bank] entered into the following loan transactions:  [listed]
(collectively, the 'CBT Loans')" (Amended Compl., DN 54, at 93:22) and
alleges, "[t]o the extent that IMG owed any otherwise legally valid
and enforceable obligation to CBT arising out of the CBT Loans
(collectively, the "Purported Obligations"), the Purported Obligations
constitute obligations incurred by IMG, one of the debtors.  [¶] Each
of the Purported Obligations was incurred with the actual intent to
hinder, delay, or defraud IMG's creditors."  <u>Id.</u> at 94:2-7.  In Count
10, the trustee alleges that "[g]ven that each of the Purported
Obligations were null and void, any purported liens or security
interests given by IMG in connection with the CBT Loans and Purported
Obligations were likewise invalid, unenforceable, null, void, and/or
otherwise without legal effect."  <u>Id.</u> at 96:13-16.  She adds that to
the extent the Purported Obligations are not avoidable, the security
interests themselves are avoidable as actual fraudulent transfers.

Although the trustee uses the term "loan transactions," the fact
is that those transactions were documented and the trustee has plainly
called the loan documents into question.  The court thus determines
(and the trustee does not dispute) that, on their face, the loans
purport to have been secured by security interests in the funds from
which the challenged transfers were made, security interests which, if
valid, would, under <u>First Alliance Mortgage</u>, defeat the trustee's
claims.  In short, it would be unfair and unacceptable to permit the
trustee to allege "[the Bank's] unusual and wide-ranging banking
relationship with IMG and Wannakuwatte" and to seek specifically to
avoid IMG's "obligations" to the Bank and the Bank's "security
interests in IMG's deposit accounts" (Amended Compl. at 96:21) without
permitting the Bank to cite the loan documents, loan histories, and
bank statements evidencing that relationship and those obligations and
security interests.

The Bank contends, among a number of other arguments, that the
applicable statute of repose requires dismissal of Count 10 of the
Amended Complaint — the trustee's claim to avoid the Bank's security
interests in IMG's deposit accounts.  If decided in the Bank's favor,
the issue would be dispositive of the entire action as against the
Bank under <u>First Alliance Mortgage</u>, because the court would conclude
that the loans repayments challenged in Counts 1, 2, and 4 were made
from the Bank's collateral and did not deplete assets that would
otherwise have been available to the estate.  Because the transfers
would not be avoided, the trustee's objection to the Bank's claims,
Count 8, would also be dismissed.  For the following reason, the court
intends to continue the hearing to permit further briefing on that one
issue, as further defined below.

California imposes a seven-year statute of repose for fraudulent transfer causes of action. "Notwithstanding any other provision of law, a cause of action under this chapter with respect to a transfer or obligation is extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred." § 3439.09(c). The Bank contends this statute of repose applies to the security interests securing all of the Bank's loans to IMG, even those where the funds were advanced within the seven-year period, because the security interests were created more than seven years prior to the petition date, when IMG signed a Business Loan Agreement with a future advances clause. That is, IMG purported to grant the Bank a security interest in its deposit accounts to secure all loans then existing or that might be incurred in the future.

The trustee contends, first, the court should not consider the Business Loan Agreement because it is outside the four corners of the complaint; that is, the trustee did not refer to it in her Amended Complaint and the "Trustee's claims asserted do not depend on that document in any manner whatsoever." Trustee's Opp. at 50:3-5. The court has addressed and rejected this argument above. Next, the trustee contends the validity of the Business Loan Agreement is in question "due to its potential illegality." Id. at 50:7. Specifically, the trustee claims that before the court can determine the statute of repose issue, it must first determine the validity and enforceability of the loan documents, and in the trustee's view, "there are substantial reasons to question the[ir] validity and enforceability." Id. at 14:20-21. Apparently based on the alleged complicity of the Bank in Wannakuwatte's scheme, the trustee suggests the loan documents were void and illegal as against public policy. Acknowledging she did not plead illegality in the Amended Complaint (or the original one), she cites case law for the propositions that (1) where the evidence suggests illegality, the court must raise the issue sua sponte if the parties have not done so, and (2) no party may be estopped from raising the issue of illegality. Finally, the trustee contends, resolution of the issue would require an assessment of the parties' "knowledge, purpose, and intent" (id. at 20:6), which could not be determined on a motion to dismiss.

The trustee did not seek in either complaint relief on the ground the underlying loans or security interests were illegal as against public policy. She sought relief solely on the basis of the California Uniform Fraudulent Transfer Act. More important, she has cited no authority for the proposition that the illegality of a contractual obligation, even if proven, provides an exception to the seven-year statute of repose, which is an "absolute backstop" to fraudulent transfer claims (Donell v. Keppers, 835 F. Supp. 2d 871, 878 (S.D. Cal. 2011); In re JMC Telecom LLC, 416 B.R. 738, 742 (C.D. Cal. 2009)), and the court is aware of none.

Third, the trustee claims the Bank's statute of repose argument "depends on a convoluted interpretation of various contractual provisions that are circular and thus inherently ambiguous."

Trustee's Opp. at 50:8-9.  The trustee does not explain the argument other than by citing the definition of "Loan" in the Business Loan Agreement.5  The trustee does not explain or even suggest how the provisions of the Business Loan Agreement are circular or ambiguous, and to the contrary, they appear to be commonly used provisions for the securing of future advances.

Next, however, the trustee correctly notes that the statute relied on by the Bank, Cal. Civ. Code § 2884, does not apply to the Business Loan Agreement.  The Bank cited § 2884 as supporting the validity of the future advances clause in the Business Loan Agreement.  The section states:  "A lien may be created by contract, to take immediate effect, as security for the performance of obligations not then in existence."  The trustee, in turn, cites Cal. Civ. Code § 2914, which states:  "None of the provisions of this chapter apply to any transaction or security interest governed by the Uniform Commercial Code."  The parties do not dispute that the Business Loan Agreement, purporting as it does to create a security interest in personal property, is governed by California's version of the Uniform Commercial Code.  Civil Code §§ 2884 and 2914 are both in Chapter 6 of Title 14 of Part 4 of Division 3 of the Civil Code; thus, § 2914 makes § 2884 inapplicable in this case.

Finally, however, in its reply to the trustee's opposition, the Bank cites Cal. Comm. Code § 9204(c), which reads, "A security agreement may provide that collateral secures . . . future advances or other value, whether or not the advances or value are given pursuant to commitment."  This is the first time that section has come up in the briefing of this motion.  The Bank also cited in its reply a number of other provisions of the Commercial Code that were not originally addressed and that the trustee has not had an opportunity to address.  Thus, the court will permit both parties to submit supplemental briefs, limited to four pages each, addressing the priority as between, on the one hand, the Bank's security interest under the February 2007 Business Loan Agreement in IMG's deposit accounts as securing loan advances made within the seven years prior to the petition date (that is, as securing future advances), and on the other hand, the holder of an unsecured creditor under California law, in whose shoes the trustee stands under § 544(b)(1) of the Bankruptcy Code.

One final note.  The court appreciates that both parties have addressed rather a large number of issues in their briefs (which the court will address if needed following its determination of the statute of repose issue), necessitating longer than usual briefs.  Nevertheless, the length of both parties' briefs was unnecessarily excessive, and the court will appreciate greater succinctness in the future.  The court will hear the matter.

---

1    The trustee "assumes for the sake of argument that transfers made to a secured creditor consisting of property that is subject to

that creditor's security interest are not avoidable as fraudulent transfers (where the creditor's underlying security interest or lien is fully valid and enforceable). The Trustee reserves all rights to challenge this premise going forward in this adversary proceeding." Trustee's Opp., DN 102, at 3:26-28. This issue was squarely raised by the Bank's motion and the trustee was plainly called upon to respond to it.

2     The list is not attached to the Amended Complaint but the Amended Complaint refers to the list as "the attached Exhibit 'A'." Amended Compl., DN 54, at 60:20. It thus appears the list was omitted from the Amended Complaint inadvertently.

3     It may be technically true the trustee's allegations do not depend on the substantive provisions of the loan documents, but they depend on the existence of the loans themselves, of which the loan documents are evidence.

4     The court rejects out of hand the trustee's contention that the allegations in the complaint suggestive of the loans themselves or the loan documents were included solely to negate the Bank's good faith defense, not as part of the trustee's affirmative claims, and that the loan documents should not be considered for that reason.

5     "The word 'Loan' means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing . . . ." Trustee's Ex. F-2, p. 6.